You'll hear argument next in Case 18-1048, G.E. Energy Power Conversion France v. Outokumpu. Mr. Draboretsky? Mr. Chief Justice, and may it please the Court, if this case involved a domestic arbitration agreement, G.E. Energy could enforce it as long as it could satisfy domestic non-signatory enforcement doctrines like equitable estoppel. The question here is whether the New York Convention prohibits that same result for international arbitration agreements. It does not. The Convention is simply silent about enforcement by non-signatories. That silence is consistent with the Convention's design, which sets a floor, not a ceiling, for enforcing arbitration agreements and awards. The Convention says that states must do certain things to promote arbitration. It doesn't say they can't do more than the Convention requires. Moreover, Article II, the principal provision about arbitration agreements, is especially short. It is not a comprehensive scheme that displaces all sovereign authority to enforce domestic laws about arbitration agreements. All relevant sources of meaning understand the Convention this same way. Other contracting states are close to unanimous that the Convention does not preempt domestic law allowing non-signatory enforcement. The United States, the restatement, unsatural, and leading commentators agree. And allowing doctrines like equitable estoppel serves the Convention's overriding purpose, to overcome widespread resistance to arbitration. The Eleventh Circuit nevertheless interpreted the definition of agreement in writing to preclude non-signatory enforcement. This Court should not make the United States an outlier by adopting that position. Article II.2 just specifies the kinds of agreements that states, at a minimum, must recognize. It doesn't limit who can enforce them. Respondents themselves don't defend the Eleventh Circuit's signature-based rule. They concede that all kinds of non-signatory enforcement doctrines, including even some kinds of equitable estoppel, are okay, just not the particular type of equitable estoppel here. That incoherent project of parsing some non-signatory enforcement doctrines from others has no basis in any of the tools of treaty interpretation. Roberts, if you and I have an agreement to arbitrate, and even if you tell me, you know, I might have Mr. Hacker do most of the work under it, and I just want to make that clear to you, and then you do hire Mr. Hacker to do all the work in it, he can't be compelled to arbitrate with me if I don't like the quality of his work, right? He's not a signatory to our arbitration agreement. Maybe he doesn't even know about it. But the fact that you and I think, no, you're going to get him to do it, and we think we're going to arbitrate all our disputes, he's not bound to arbitrate. I think whether he could arbitrate would depend on the domestic doctrine about non-signatory enforcement and on the fact that you've posited, I think, on an equitable estoppel theory, if you were to sue him, rather than me, for claims that are intertwined with our contract, the contract that you and I have, under an equitable estoppel theory, he could be compelled to arbitrate. That was the same sort of fact that you and I have. Arbitration is based on agreement. And here, somebody who never agreed to arbitration is being forced into arbitration, even though he has a clear right to take his dispute to court. Arbitration is, of course, a matter of consent. But as long as you and I have a valid arbitration agreement, that's the key consent. Then the scope of that arbitration agreement is another question, and that's determined in the Chapter 1 context by domestic law. That was the situation the Court faced in Arthur Andersen, and the Court saw no inconsistency between Chapter 1 and an equitable estoppel theory. There was no consent problem with remanding for the lower court in Arthur Andersen to consider whether the requirements of equitable estoppel were satisfied to allow a non-signatory to compel arbitration in a domestic context. The question was, what if the law of the jurisdiction, whose law would be chosen, permits arbitration without any consent whatsoever? I guess you'd have to say that that's okay, right? That the Convention doesn't prevent that. That's simply not the problem that the Convention was trying to solve. The purpose of the Convention was to address the problem of under-enforcement of arbitration agreements. If there is some country out there or some State that is compelling arbitration in the way that you're describing, the Convention doesn't directly deal with that except perhaps in Article 5, which would provide a public policy backstop for the country in which enforcement of an award is sought to say, we're not enforcing that award because it contravenes our public policy. So you're saying that when the United States entered into the Convention and when it then implemented the Convention through the FAA, Congress didn't understand arbitration to mean voluntary arbitration? That, you know, my question, I guess, is the same as Justice Alito's. It seems odd that Congress would have passed the implementing legislation on the view that another contracting State could compel arbitration without any consent whatsoever. Justice Kagan, I think this goes to the core question of what the Convention is trying to do. The Convention is trying to set forth minimum standards by which other countries will recognize and enforce arbitration agreements. And to be sure, the Convention does not require any country to recognize forced arbitration, so to speak. The premise of the Convention is that the floor, the minimum that other countries are agreeing to do, is to recognize valid arbitration agreements. By the same token, it doesn't preempt all domestic laws, including theoretically although there's no evidence that this is a real problem, the kind of forced arbitration that you're positive. In the situation that we have here and in the Chief Justice's hypothetical, there's no question of forced arbitration. There is indisputably a valid arbitration agreement. The only question is, can domestic law supply non-signatory enforcement doctrines in order to allow, again, a non-signatory law? And the fact is, I mean, this is started out very broadly, and suddenly you get worried are some people who the seller agrees that I'll go to arbitration. I agree with you. Okay? Now, I don't want to go. And it's not against you. It's against him. I didn't agree to that, or did I? Now, I thought this is quite narrow, or could be. What actually I, the seller, did is I agreed, I signed a party, and said I'll go to arbitration, but when you use the word seller, which I think maybe it was me, is that right, your opponent, that includes subcontractors in this contract. And by the way, you're a subcontractor, and you were listed, so it isn't exactly involuntary. Or you and I agree, and I say our contract, including arbitration, is for the benefit of Mr. Johnson, who is a third-party beneficiary for everything including arbitration. And then the question is, can Mr. Johnson bring me in? Say, he didn't sign it. You signed it. Now, can't we decide it on a narrow ground like that by, indeed, leaving up to the whether it really isn't true that a third-party beneficiary can or the person listed in the seller side can, and just say it doesn't limit it to where you're the one who wants to bring me into arbitration? There are well-established legal doctrines. I don't want to make my argument for you. I want you to tell me, quite straightforward, and I'll hurry up a few seconds, is that a possible argument in this case? Will you send it back? Yes, Your Honor. The Eleventh Circuit held, the Eleventh Circuit held that only the signatories to the arbitration agreement could enforce it. And we get to say no, that's not right. Which is a fairly basic proposition of law. So if we're going to send it back to say, well, why don't you see if you can enforce arbitration against somebody who didn't sign the agreement or who wasn't, it's one thing to say, okay, your parent company or your subsidiary or whatever. And the fact that you might say, or subcontractors, doesn't mean that any particular subcontractor wants to arbitrate. So you're going to send it back for – I mean, if someone is going to adopt such a radical proposition, it probably should be us, rather than send it back to the Eleventh Circuit and say, well, if you want to go against all of our precedents of arbitration, fine. But we're not going to do it. So, Mr. Chief Justice, I don't think this is contrary to all of this Court's precedents on arbitration, just the opposite. In Arthur Anderson, the Court remanded for the lower court to consider whether an equitable estoppel theory would allow a non-signatory to compel arbitration. So that's precisely the case. Ginsburg. Can we understand why Respondent should be equitably estoppel? This case is going, in the brief so far in the oral argument, on a level once removed from the basic facts on the ground. So what is it in this case that makes the doctrine of equitable estoppel appropriate? Let me make two points on that. One is the point that I think Justice Breyer was making. On these particular facts, GE Energy is defined under the contract as a party. The term parties is defined to include buyer and seller. Seller is defined to include subcontractor. And GE is listed in the contract as one of the subcontractors that the parties contemplated using. And so we are actually a party to the contract, even though we didn't put – even though we didn't ink the contract with our signature. In addition to the – Even though at the time the contract was made, the subcontractors hadn't been picked, so that we – GE was on a list of potential subcontractors, but was not, in fact, a subcontractor at the time of the arbitration agreement. I don't believe that it had been picked, but there were active and extensive discussions, including with the Respondents, about using GE as a subcontractor. So it was certainly contemplated, and if you follow the definitions of seller and buyer and seller and parties in the contract, that GE is actually a party to the agreement. As a – on a more doctrinal level, in terms of equitable estoppel, equitable estoppel is a way of inferring consent from conduct. And if the Respondents sue us, as they did in this case, on a theory that depends on the duty of care arising out of the contract, they are in essence suing us on the contract. They can't cherry-pick to invoke the duty of care from the contract, but to avoid their agreement to arbitrate disputes under that contract. That would be the doctrinal basis for an equitable estoppel theory. And this is – We're going well down this rabbit hole on whether equitable estoppel applies in this case, but I had – I had preceded him maybe on the mistaken assumption that the question whether equitable estoppel is recognized as a viable theory under the Federal Arbitration Act isn't before us. The only question before us is whether anything in the Convention precludes an argument like that to be made under the Federal Arbitration Act, whether or not it might succeed. Am I – but am I mistaken? That's correct, Justice Gorsuch, and I think that goes to Justice Breyer's point as well. The actual question presented here is quite narrow, and that is whether there is anything in the New York Convention that prohibits the application of equitable estoppel. If it exists, without prejudging whether it exists. Correct. And that's much the same as the posture in Arthur Anderson, where the Court sent the case back for the lower courts to determine whether equitable estoppel exists under the applicable law, and if so, whether it could be satisfied. But, Mr. Duvaretsky, that is the question. So let's take a look at Article 2, and specifically the third sentence, because the third sentence says, And I have to tell you, I think that the best understanding of the term parties, looking at the three sentences of Article 2, let's just assume that the best understanding is the parties to the agreement. So this says the parties to the agreement are requesting the arbitration, and that's   Now, that raises the question, who's the party? I'm with the Chief Justice. If you're talking about an alter ego or something like that, or a successor in interest, maybe that person counts as a party, even though it's not the signatory. But there's some limit, isn't there, that's imposed by that language of the parties? Justice Kagan, I think the key point is that Article 3 does not say only the parties. In other words, the bare minimum that contracting states agree to do is to refer a case to arbitration if the parties, whether you think that's to the agreement of the court. Let me read you a few sentences, Mr. Duvaretsky, and you tell me whether you always have to say shall only when you say shall. If I say federal courts shall have jurisdiction over federal questions, would this statute also permit those courts to exercise jurisdiction over state questions? No. And, Justice Kagan, I will I'm going to give you one more, just to prove the point. Shareholders shall appoint two directors to the board. Does that mean shareholders can appoint 20 directors to the board? No. Because shall means shall only in many circumstances, right? It depends on context. It does. And the context here, based on the purpose of the convention, based on how this convention has been nearly universally understood by contracting states, which is a key factor in this Court's treaty interpretation jurisprudence, is that this provision, Article 2.3, like the rest of the convention, is just setting a floor on what contracting states agree to do. So at a minimum, they agree that they shall, the courts shall refer cases to arbitration when requested by the parties, but not that they shall only do so. You can, of course, come up with examples where shall does mean shall only, but it doesn't mean that here. Right. Well, I guess, so that brings us back to the question that Justice Alito started us off with, because I think that that's relevant to the context in which we're viewing this convention, which is the assumption on the part of the United States Congress when it passed the FAA, and surely the, those who entered into the convention, the convention was a matter of, excuse me, that arbitration was a matter of voluntary consent. I mean, so if it's a matter of voluntary consent, and everybody thinks that that's what arbitration is, shouldn't we read the parties to be, you know, the parties, nobody else? And again, I would take you back to Arthur Anderson. Certainly under our domestic law, arbitration is generally understood to be a matter of voluntary consent, but the Court saw no issue with the possibility of an equitable estoppel theory that would allow a non-party to enforce. The convention does not contain an independent consent requirement. It just doesn't, it just doesn't say that. And it would be inconsistent with its purpose to have that, because, again, the backdrop to the convention was there was widespread mistrust of arbitration agreements. Agreements were not being enforced. The convention set out to remedy that problem and to provide for more enforcement of arbitration, not less than that. Moreover, we often, I'm sorry. Is it necessary to go so far as to say that the convention says nothing about what the relevant law of a particular jurisdiction says about who can enforce an arbitration agreement? Or could it say, could it perhaps go beyond strictly the signatories to the agreement and encompass some other non-parties that have a sufficient connect, that have a clear close connection, as would be the case with somebody who was equitably estopped? If I may answer. I think that's right, and it's not just equitable estoppel. There are a number of non-signatory doctrines, including alter ego and veil-piercing, for example, that the other side points to as valid under the convention, even though those can't be thought of as consensual. Just the opposite, an alter ego theory and a veil-piercing theory are disregarding the consent of the parties and holding them to the agreement anyway. Thank you, counsel. Mr. Ellis. Mr. Chief Justice, and may it please the Court. The New York Convention plays an important but limited role in the recognition of international arbitration agreements. It requires contracting States to recognize and enforce those agreements in certain ways, but, as my friend says, establish a comprehensive set of rules for arbitration. For two fundamental reasons, the Eleventh Circuit was wrong to read into the writing requirement of Article II, a categorical prohibition on compelling international arbitration on the basis of estoppel principles. First, the convention as a whole only ever requires contracting States to enforce arbitration agreements. It never prohibits them from doing so. And second, Article II, Section 2, is a rule of presumptive validity. It speaks to when a court must recognize an arbitration agreement as valid. It does not speak to the scope of valid agreements, including who may be bound or who may invoke those agreements. Now, Respondents provide a series of alternative grounds for refusing to compel arbitration in this case, but there's no reason for this Court to pass on those grounds in the first instance. Just as the Court did in Arthur Anderson for the FAA, the Court should make clear that the convention does not categorically prohibit enforced compelling arbitration on estoppel grounds. Sotomayor, I have two ways to reach your result. One is to read Article II and say what you seem to be saying, which is that it only requires or compels arbitration in one circumstance, but a contracting State can compel arbitration in any way that it wants, even without a written agreement. That seems to be the essence of your argument, correct? Yes. That's odd. Indeed, because as the Chief Justice noted and Justice Kagan noted, it seems always that a signed written agreement respecting consent is a minimum requirement. Or another way to get to where you want to go, another reading, is that Article II does not allow contracting States to compel arbitration whenever it wants, even without a written agreement, but that they can compel it if someone is a party, that that's undefined. And that seems to be how most other contracting States have read this, which is that there's a lot of leeway for States to determine who's a party to that written agreement. And they can do that through normal principles of privity or normal principles of contract interpretation, including alter ego and veil piercing and all the other things that your adversary accepts can be done. You don't need, as I think the circuit below wrongly required, it seemed to say you need that party's signature on the agreement. That's right. So there's common ground. But I do think within that common ground there has to be a limiting principle established somewhere. And I don't think it can be that you can have an oral agreement or a State can say with respect no essence of consent whatsoever, that we're just going to let anybody if you signed an arbitration agreement about the manufacturer of this thing, equitable principles are always going to let anybody come in and let them be sued. So assuming we're on common ground, or I am, that we have some basis to say that what's the limiting principle after that? What's the limiting principle of equitable estoppel? It can't be every single type of equitable estoppel is okay. Sure. So a couple points, Your Honor. And happy to win on either. By the way, on this case it's easy to win. Right. And we're happy to win on either ground. On this case, no matter what the theory of equitable estoppel is, a seller who's GE, that seems like a fairly straightforward case to me. So we haven't taken a position on the ultimate resolution, but we agree, and it sounds like you agree, that the Eleventh Circuit's rule is just wrong, that it's not categorically limited to signatories. That's enough to resolve this case. Now, as for limiting principles, I think there are limiting principles. I think there are two types to consider. The first limiting principle is to consider when — what's the limit on when a contracting State is required to compel arbitration? And I think there certainly are limits. I think Article 2, Section 3 is the relevant provision, not Article 2, Section 2. And the question there says that the parties before the — have to have made an agreement. So I think the question is, can you — does the domestic law consider the parties to have made an agreement to this written agreement? Now, the other limiting principle is whether States are then prohibited from, under their own — under domestic law, to recognize other types of arbitration agreements. I just don't think the contracting — the convention can be read to impose those limits. That doesn't mean that you can then say, enforce an oral arbitration — or require another State to enforce an oral arbitration agreement under the convention. It would not be, clearly, not be under the convention. But a — but a contracting State has not given up its right to enforce the — Sotomayor, that's going much further afield than I think other contracting States have. And it's reading Article 7 into Article 2, which, to me, is illogical. We don't think you have to read Article 7 on its text to do that. I will say that it's fairly uniform, that Article 7 at least should inform the scope of Article 2, that the same sort of most favorable rules should apply to enforcing arbitration agreements as — Sotomayor, that seems contrary to the very strict requirements that you need a written agreement between the parties. Absolutely. I think that's a very different argument than saying you have some play in the joints with respect to who parties are and that domestic law can inform that. And I want to be clear. The convention does not apply to arbitration agreements that are not written or that don't meet the presumptive — the validity requirements in Article 2, at least insofar as there's a debate between whether Article 2, Section 2 is exhaustive or non-exhaustive. But either way, the convention isn't going to apply and therefore isn't going to require the enforcement of an agreement that doesn't meet the requirements of the convention. But the convention doesn't further than say that a contracting State cannot enforce beyond that.  To a question that Justice Kagan raised, there are these privity-like people and then there's this doctrine of equitable estoppel, which we're told that many of our treaty partners do not recognize. So what you're suggesting is that we should recognize this equitable estoppel even though our treaty partners would not, which could yield divergent results and give you a real problem at the enforcement end because a country that doesn't recognize equitable estoppel will hesitate to enforce an award that was based on that theory. So you can distinguish these successors in interest, maybe Assinores, privity-like people from this equitable estoppel, which is not universally embraced by our treaty partners. Yes, Your Honor. I mean, the Respondent has argued that estoppel, equitable estoppel, is an outlier. I think that's a bit of an overstatement. I think that there are very comparable doctrines around the world that look a lot like U.S. equitable estoppel principles. The Titan unity decision from Singapore adopts U.S. estoppel principles by name, by citing to U.S. courts. And then there's the veneer contra effect improbrium in civil law countries that look a lot like equitable estoppel. But that has been described as the Latin phrase you just used as akin to traditional estoppel as opposed to this equitable estoppel. Sure. That's fair enough. I guess the overarching point is that nothing in the convention draws the sort of line that Respondent is trying to do. It can't be the party line that they've pointed to. I don't know why traditional estoppel or veneer contra effect improbrium would be more akin to a party than not. It can't be the consent principle that they point to for the reasons that my friend says. Piercing the corporate veil is at least based on equity and fairness and contrary to sort of formal express consent as any equitable estoppel principle is. And so at the bottom, what you've – our view is that the convention simply doesn't speak to those principles and what other domestic law principles that apply. Ginsburg. Before your time runs out, I'd like you to answer specifically. In a public citizen's brief, they cite a case called Todd v. Steamship Mutual Underwriting Association. They say a U.S. worker who was injured by his employer in Louisiana sued that insolvent employer's insurer under Louisiana's direct access statute and was required to arbitrate his personal injury claim before an arbitration panel in London. That sounds like a real horrible – is that the result of the position that you're pressing? So I apologize. I'm not familiar with the facts of that particular case and exactly how they got to that result. I will say that there are – I think the convention itself does not limit contracting states from enforcing arbitration. There may be other limits. There may be other limits in the FAA itself that don't need to – the court below didn't reach and this court doesn't need to get into. Justice Gorsuch has a question. Counsel, I understand that different countries may have different views about equitable estoppel or other kinds of non-signatory, non-strict consent arbitrations. Is there any disagreement among the countries about how to read the convention itself with respect to whether it creates a floor or a ceiling? Not that I'm aware of. The only – at least not of any significance. The only one that I'm aware of is this Dravore decision from the British Columbia courts that reads Article 2, Section 2 in the way the Eleventh Circuit does. But we've cited cases from Germany, France, and Switzerland on 26 to 28 of our brief. The Berman brief has collected cases from 21 to 30 of their brief. The Jundtstraal recommendation is inconsistent with the Eleventh Circuit's decision. That represents the views of about 60 different countries. The model – or the implementing legislation from Peru, from Singapore, from Australia are in contrary to the Eleventh Circuit's view of the convention. And even the Dravore case from British Columbia has not been followed by subsequent British Columbia courts. And it has been criticized. Roberts. Thank you, counsel. Mr. Hacker. Mr. Chief Justice, and may it please the Court. GE cannot compel Otokumpu to arbitrate its tort claims with GE because there is no written arbitration agreement between them. I agree that would generally not be an obstacle in a domestic arbitration case, because as this Court held in Arthur Anderson, Chapter 1's agreement enforcement provision, FAA Section 3, does not limit enforcement to, quote, parties to a written agreement. But the lack of a written agreement is decisive here because the convention's enforcement provision, Article 2, Section 3, is limited to the parties to a written  enforcement provision. Nonparties cannot enforce agreements in cases under the convention. That rule is subject to two important corollaries that have already been discussed this morning. First, the convention does not prohibit contracting States from enacting other domestic laws that can mandate international arbitration on other terms, including oral agreements or absent consent. But as the commentators agree, and as the United States agreed this morning, arbitrations under such statutes do not proceed under the convention, meaning that the resulting awards will not receive the benefit of the convention and its near-automatic enforcement provisions as Justice Ginsburg warned. That kind of distinct extra-convention statute is not at issue in this case because the United States has not enacted one. Chapter 2, instead, makes the convention itself controlling in all international arbitration cases. Chapter 1 applies only where the convention does not supply a different rule, such as FAA Sections 6 and 7, which govern motions and witnesses. The convention, however, does provide its own rule for enforcing arbitration agreements, and therefore that rule controls. The second corollary also discussed is that enforcement by a party under the convention includes its privities under principles well known to and even discussed by the convention drafters. Those principles differ categorically from the broad modern estoppel doctrines that GE is trying to invoke here. Mr. Hacker, I'm sorry to interrupt you, but I just want to spin back a little bit. Did I understand you to say as a matter of domestic law you would agree that this contract could be enforced by GE under equitable estoppel, or did I mishear you? I hope you misheard me. I definitely do not believe this contract can be enforced by GE. The arbitration clause cannot be enforced by GE because GE is not a party to the contract. It is not a party to the arbitration clause, and this goes to Justice Breyer's question, I think, about the sort of more narrow ground. I thought you said at the first part, Arthur Anderson, and yes, there would be a real question here, but there's no real question here because of the convention. That's in a domestic arbitration case, Arthur Anderson would control. He would ask whether the controlling State law allowed for equitable estoppel. Okay. This is not a domestic arbitration case. So under domestic arbitration rules, there would be a real live question here. You'd look to the applicable State law. There's no applicable State law here. It's German law, and you'd have to determine whether or not equitable estoppel applied here. This case is governed by the convention, which applies its own rule. But for the convention, despite the international character of this agreement, we'd have a choice of law problem undoubtedly, but we'd find some choice of law and look and see whether equitable estoppel is a permissible argument to be made in an arbitration case like this. In a domestic case. That's correct. This is a convention case. If it weren't governed by the convention, but for the convention. Correct. A choice of law problem. Yes. Okay. I mean, that would be the first question would be choice of law, and the second question would be whether the law authorizes. This is a convention case. Would this be a question under regular estoppel rules? Forget about equitable estoppel. Would they have a potential claim under estoppel rules? No. Why not? Because traditional. If they were defined as sellers in the contract, why wouldn't estoppel rules, not equitable rules, but mere estoppel rules, make them a seller? All right. So. You signed a contract. You agreed to arbitrate with the sellers. Sellers were defined as a list of subcontractors or subsuppliers. They were among those. Why wouldn't estoppel stop you? Normal estoppel rules. If I could separate out two questions. First of all, they're not a party to that arbitration clause. And when I show you why they're not a party to the arbitration clause, that's going to answer the question why. Why? They're not a party to the arbitration clause because, as we know, under international law, arbitration clauses are separable from the rest of the contract. You don't look to the contract generally to determine who is a party to the arbitration clause. You have to look to the clause itself. Look at the start with common sense about what's going on in that contract. If subcontractors are defined for all purposes and defined for purposes of the arbitration clause as parties to the arbitration clause, it's a bilateral agreement, right? You've got a thousand subcontractors on site, including local drywallers, paint suppliers, maintenance guys. If all of them are agreeing implicitly. Sotomayor I'm reading the contract. When seller is mentioned, it shall be understood as subcontractors. A million or not included, except if expressly stated otherwise. Where in the arbitration clause are they expressly stated otherwise? They're not stated otherwise in the arbitration clause, except that the arbitration clause is separable. And remember, Your Honor, remember, this is so important, Your Honor. So what? Because. Where does it say that subcontractors are not sellers for purposes of the arbitration clause? It doesn't say it in the arbitration clause, but we know, we know, Your Honor, that seller doesn't actually mean subcontractor everywhere in the contract. The next paragraph, literally after the one you're quoting, says that the seller has to construct the whole mill. That can't be all the subcontractors. Article VI of the agreement says that the seller receives all kinds of payments from Otokonpu. We know that not all the subcontractors are receiving all the payments. These are good arguments, but it seems to me that it's one thing to say we're going to force all these suppliers into arbitration, compel them without their consent. That would be one thing. But it's quite another to say that you agree to this contract, where they can bring arbitration against you. And there's no consent problem there, it seems to me. You've consented. This is the scope of your consent we have to address. But the idea that you consented to something seems hard to dispute, isn't it, as a matter of domestic law? I think that's just sort of my worst point. Domestic law is not at issue here. It's the convention which requires a written agreement between the parties to arbitrate. So the question is, where is the written agreement between us and GE and the local paint guy to arbitrate claims between us? Breyer. And I, to do this, I want your reaction. A. James Kasner, who was my property professor and a great man, would also often use the word, if we look at sentence 3 of Article II. Of course that word, parties, does not mean the parties in court. It means the parties who signed the agreement. And what the third says, that the court shall, at the request of one of the parties, as you emphasize, refer the matter to arbitration. But you yourself say, sometimes a person who is not a party can force you to go to arbitration. That person you call a privity, a word full of obscurity. So the words that he used were not privity. He'd say in a thing like this, it's one of the parties or someone who stands in the shoes of a regular party, of an ordinary party. Now, most of what you say is consistent with that. And if you use those vaguer words, you pick up what we said in Anderson, because sometimes such a person who is a non-signatory would stand in the shoes because of assumption of the contract, because it went through bankruptcy, because we pierced the corporate veil, because there's theory of alter ego, because there's an incorporation by reference, third-party beneficiary theories, waiver, and, he says, estoppel. So it sounds what we're really arguing about. Is this the kind of estoppel? And are these the circumstances of estoppel that will put your adversary in the shoes of a party? If I am right, and you're nodding your head, which is a good sign. Roberts. Only that I understand your question. Breyer. Oh, okay.  I don't think I can agree with where you're getting at. Breyer. All right. Then you can say it's not right. But I thought that that's a question which I don't know the answer to. And that really the Eleventh Circuit didn't use this wonderful expression, stand in the shoes of. And thereby pick up the Arthur Anderson, or at least some of them. Since they didn't, we could send it back and say the district court seemed to think they should, but here they're making an excellent argument on both sides. Now, you got my question. It's what to do with this case. Depends on an assumption. What do you think? So the answer is, I don't think stand in the shoes is any more clear than. Oh, no, it isn't. But it doesn't purport to be. Right. Privity explains almost all of the situations in which you'd be concerned about whether or not a non-party, non-signatory, by which I mean somebody who's not literally named, actually is standing in the shoes of a signatory. That explains almost all of the international cases that don't involve traditional estoppel. And that is a very easy and clear line. What do we have to decide? The Eleventh Circuit said a non-signatory can never enforce, right? Not quite, no. It said a non-signatory cannot enforce. It said non-signatories include their privities. It said it twice. And so we know from the Eleventh Circuit's rule that that includes privities. And so this Court could be clearer about that. But the Eleventh Circuit was absolutely correct. It also emphasized the importance of a signature, which may look like an overstatement because we know Article II includes documents exchanged in letters and telegrams. But, of course, the Eleventh Circuit was only talking about a signature because G.E. was not pointing to any sort of separate document exchanged in a letter or telegram. The question was whether there was a written agreement, or they were, it should have been, whether they were privity with the parties to it. Well, how does this concept of privity, which as far as I'm aware is a feature of Anglo-American law, become the controlling standard under this international agreement? Well, it's not limited to Anglo-American law. There are different types of privity doctrines recognized throughout the world. But different types of privity doctrine. I don't know. What is the doctrine of privity under German law? I don't know what the German word is. I'm sure it's extremely long. But it's going to mean some version of the same thing. The question being asked, or whatever, you know, privity rules you're invoking are, is this party the same party for some reason as a signatory? That's not the question that is raised by the equitable estoppel claim that G.E. is raising. It's a fundamentally different question about, I agree. I am not a signatory. I'm not a privity with a signatory. I just want to make them enforce, make them arbitrate with me because, dot, dot, dot, because it's more convenient to, it seems efficient, it seems fair, whatever rules, you know, the local jurisdiction might invoke. They want to say that those local rules, the equitable fairness justice principles of a given state can trump what the convention says, at least in a convention governed arbitration. The convention says it's supposed to be a written agreement between the parties. I think the argument on the other side would be that equitable estoppel, restoppel, whatever you want to, however you want to describe it here, is that your client effectively did consent. That's the way in which it would be rephrased to. I understand. So what do you do about that, number one? And number two, in a completely different line, and take them as you choose, okay? Normally when we interpret treaties to bind domestic law, we require a pretty clear statement when we're staying Congress's hand in an area. And if the FAA hypothetically, and I'm not passing on it, we don't need to, were to allow equitable estoppel doctrine, and the convention didn't allow domestic law to do that, wouldn't we require a clearer statement than what we have here? Well, let me answer the first question, which I think I'll actually answer by the convention. The convention rule is not effectively consent. That's not the principle the convention adopts and requires for convention governed agreements. It requires a written agreement between the parties, and it requires a court to enforce an agreement between the parties. It has to be the parties to the agreement are the only parties that can obtain enforcement under the convention. So I think that's the clear answer. Except for the fact, I'm sorry to interrupt, except for the fact you've admitted that there are other doctrines that allow third parties to be brought in as privities who may not have strictly consented. Alter ego theory, veil-piercing theory, it's a fiction to call that consent. I disagree, Your Honor, because what you have is a consent, a written agreement between parties, and the counterparty in that situation is agreeing to arbitrate with, you know, thieves. Whoever thieves is defined as, they're arbitrating with thieves, and whoever stands in thieves' shoes. That is a fundamentally, there's a consent there, there's a written agreement there, and there are doctrines that international law recognizes for determining who properly stands in thieves' shoes. There is no universally recognized doctrine of international law that allows somebody who is not thieves in any sense to come in and say, even though you never agreed to arbitrate with me, you're suing me, and let's be clear about this, you're suing me in tort outside the contract. These are not claims that are based on the contractual duty between Odukampu and thieves. These are tort claims governed by Alabama tort standards, and you never agreed with me in a written agreement to arbitrate those kinds of claims. Nevertheless, I'm going to say that, you know, I would, I think it's fairer for me to do that. I want to invoke your agreement. Kagan. Mr. Hacker, sorry, did you? No, go ahead. Your argument here does rest on reading Article 2, and especially Sentence 3, as not just a floor, as a, as a, as a, as a floor on a ceiling, both. That's right. So where do you get that understanding from? I mean, because Mr. Dvoretsky, the Solicitor General, says the parties to the convention were just concerned about people not enforcing arbitration agreements. They didn't have it in mind to draw up a whole set of rules about when to and when not to. That's left up to the states. What's your best argument to the contrary? So a couple points. Let me start with a text and where I think the United States agrees with us, which is the convention does make it a ceiling that you have to have a written agreement. That's required. You can't proceed under the convention absent a written agreement. That comes out of Article 2.1, which says the contracting states shall recognize a written agreement. It's the same language, then, in Article 2.3. The courts seized of an action shall, shall at the request of one of the parties refer the parties to arbitration. It all fits together with an Article 2. Those are all mandatory requirements in order to trigger the protections of the convention. Why is it so clear that the first one is a mandatory requirement? Well, the United States concedes it, and they're right to do that for the reason you said, Your Honor. Shall sometimes is a mandatory requirement. The examples you gave are good ones. The United States Constitution says the legislative power shall be vested in a Congress. Nobody thinks that means it could be elsewhere. So I think everybody agrees that the question is context. Correct. And what in the context do you think indicates that this is a ceiling? Because it's what's required to trigger the protections of the requirements of Article 4 and Article 5 for enforcement. You have to have an agreement under Article 2. But, Counselor, that's a non sequitur. I think what Justice Kagan's trying to get at and what I would like to get at is, fine, that may be what's required to trigger the convention, but that may just be the floor of what's available to States domestically, and domestically they may choose to enforce more than that. Yes. I agree with that. I think that's the question Justice Kagan's asking, and if you could address that. I meant to be answering within the confines of the convention, because that's all that's at issue here. No, forget about within the context of the convention. Right. Is there a universe of arbitration agreements that a domestic law might enforce that might not be enforceable under the convention? Yes. Yes. That's Arthur Anderson. That definitely says that you're sorry. I'm sorry. I'm sorry. I apologize. Isn't that the end of the case? If there are some universe of agreements that could be only domestically enforceable, but are not enforceable under the convention, then what? Because they can't proceed under the convention, under domestic law, under U.S. law. Chapter 2 makes international arbitration, the convention, the sole source of law governing international arbitration agreements. You cannot proceed under Chapter 1, for example, and get enforcement of an arbitration agreement overseas. Chapter 2 is the only place you can go, and Chapter 2 says the convention prescribes the controlling law, you know, unless Chapter 1, so long as it's conflicting. And we know that the convention is conflicting with Chapter 1 because the convention prescribes, requires, for convention-governed agreements, a written agreement that can be enforced only by the parties to the written agreement. It differs from Chapter 1 in that respect. There is no Chapter 1 here. Can you tell us what's going on in this very case? The party that you call Thieves has to arbitrate. There is a written agreement, and there's an arbitration in Berlin, is that right, going on? Düsseldorf. But then there is also this proceeding in the Alabama Supreme — in Alabama State Trial Court. And is that proceeding going forward? Yes. So you have two cases which, in the best of all possible worlds, because they're linked, would be heard in the same forum, one going to an arbitration panel in Berlin and the other going to a state court in Alabama. But that's the result of your view of what the convention requires. Well, if we had prevailed and we didn't get before this Court, we would just be proceeding in Alabama, as we should be. There's jurisdiction — I mean, there's — this Court has jurisdiction to resolve the certiorari question before it. But in our view, this case should be in Alabama State Court on the tort claims that we have asserted. But what I mean is the relation between the subcontractor and the contractor vis-a-vis the buyer, that that litigation ideally would be all one case. Instead, we have this split. Well, again, it might be. We have — we had an action against Thieves, decided not to pursue it, because Thieves, from the very outset, said, it's not our problem. They supplied the motors. They were the problem. GE screwed up. GE will take care of it. Don't talk to us. We pursued it for a while with Thieves. GE did begin working with us to fix the motors and provide housing for the motors. We basically had an ongoing working relationship with GE after a time. And it turned out not to be satisfactory. The problems were not solved. And their defective motors caused additional damage to our facility, which under Alabama law, and, by the way, U.S. Federal common law in the maritime context, allows a party to assert a tort claim outside the contractual relationship. I'm interested in — you want to read that sentence 3 as a ceiling. You know what I'm talking about? The Article 2, paragraph 3. Yeah, Article 2, sentence 3 is a ceiling. All right. Well — Yeah. But then the word privity doesn't appear there either. So you say almost a ceiling. No. Almost a party. No. Party plus privity. And I said, well — no, I'm sitting here. Can I think of some cases that are hard to squeeze into the term privity, but it sounds as if they should be able to stand in the shoes of the party? Smith makes a contract with Jones. He says, you know, Jones, this is for the benefit of my daughter when she's 35. This will help her a lot. And I want her to be able to enforce it. And I want her to be able to go to arbitration. I love arbitration. Jones writes back to the letter, I agree with you. Of course she can enforce it in arbitration. I love arbitration too. Don't worry. Go ahead and sign. So he signs. And now the daughter wants to go to arbitration after she's 35. Well, that's a pretty strong case for a stopper. And it's very hard to call the daughter a privity. So I tried to think of a case where does that sentence forbid that? No, because you can either call the daughter a privity, which sounds like a stretch, or you could say that is not a ceiling, but it does pick up domestic law on this matter. And by and large, when the domestic law allows a non-signatory to enforce an arbitration clause against a signatory, this doesn't forbid it. Now, what about that approach? I think the problem is what was described earlier as a choice of law problem, which I think your international commentators recognize that the law has to be governed by universally recognized international law principles. Because if you open up the door to domestic law on what seems like a, gee, that seems eminently fair situation, and say that domestic law gets to decide who gets to enforce, that creates a huge problem under the Convention, because then States can begin subjecting parties to arbitration absent their consent, unwilling parties, when the Convention clearly intends to be required. All right. So he had a list about 1,000 miles long, it seemed to me, of authorities, cases, professors, and others who say all these other people have enforced that particular sentence in a way that it allows at least some, perhaps not all, of those who are hard to call privities to enforce under certain circumstances. And this is one. What do you say? The circumstance in which it is widely, and I would say essentially universally recognized, there's only one. It's not the one Your Honor describes. It is the situation where a party begins or has even completed arbitration, or an entity begins or completes arbitration, and then later says, I wasn't a party. I don't want to be subject to the results of this arbitration. That's a situation where courts, international decisions have recognized they can be held to it, but it's not really an estoppel-slash-contract doctrine. What Justice Alito's opinion and the case in Minmetals described it as is really a waiver doctrine or a forfeiture doctrine. That's how the English court in Peterson Farms described it. That's how the U.K. High Court in Dalla described it. It's really forfeiture or waiver. It's not some opening the door to all kinds of situations when it sort of seems fair to let an unwilling party, to force an unwilling party to arbitrate. And think about the consequences of doing that. The Todd case, I believe Justice Ginsburg raised, exemplifies the problems that you have if you just say, if it's connected to the contract in some way. Remember, we had the earlier discussion from the earlier argument. The word involves can extend to the limits of the universe. Well, so can something that's related to a contract can extend to no limit. And that's what happened in the Todd case where a sailor was injured while working on a ship, couldn't recover against his immediate employer because the employer went bankrupt or in some way wouldn't pay the employer for his personal injuries. And so he went against the employer's principal, the guarantor, and the guarantor said, well, your claim for injury on a ship is connected to this contract I have with the ship owner, and that contract has an arbitration agreement, and so you have to arbitrate with me overseas over your personal injury. That's exactly the problem with opening the door to U.S. modern equitable estoppel that is divorced from the contract terms and divorced from a situation when you're really talking about a waiver where somebody has engaged in arbitration. That's the limited circumstance. It's not any kind of gerrymander. It's simply adhering to the plain text of the convention, which for convention governed cases requires a written agreement and limits enforcement of the written agreement to the parties to the agreement. Let me make one other point about the language of Article 2, Paragraph 3. Justice Kagan is absolutely correct that parties, the second use of parties pretty clearly is referring to the parties to the agreement. If there's any doubt about that, look at the Spanish versions of the convention, look at the French versions of the convention, which you'll find at paragraphs or pages 11A and 20A of our brief. It actually says of them. It doesn't say of the parties. It says of them, immediately referring back to the parties to the written agreement. So there's really no ambiguity whatsoever there that this, unlike FAA Section 3 addressed in Anderson, limits enforcement to the parties to the written agreement. That's only in convention governed cases, Justice Gorsuch. The point is it's possible for a state to adopt a separate law like Peru did and subject parties to arbitration, unwilling parties to arbitration, on whatever terms a state feels like. That's not what the United States has done. And the consequence of doing that is that you lose the automatic enforcement benefits, virtually automatic enforcement benefits promised by Article 5. The last two points I would make are recall that extension to non-parties, all the commentators, I think the United States too, says that extension of an arbitration agreement to non-parties is supposed to be rare. It's supposed to be the exception that you almost never see. Under the doctrine GE wants you to adopt under U.S. law or under international law, essentially all subcontractors would suddenly be able to arbitrate, even absent a written agreement with the subcontractor, because basically a claim between a subcontractor and the principal is in some way going to be connected to you to involve the contract. So you completely erase the idea that this kind of enforcement is supposed to be rare, supposed to be the exception, essentially be the rule in all construction cases. The other point I would remind the Court about is its own decision in the Shirt case that says the purpose of the convention is to, quote, unify the standards for recognizing agreements and enforcing awards. I submit, Your Honors, there's only one way to make the standards uniform, and that is to respect, adhere to, and enforce the uniform textual words of the convention. Thank you. Thank you, counsel. Two minutes. Mr. Jouresky. Thank you. If I could, let me make three points and then suggest possible ways to resolve this case. First, there's an international consensus in favor of non-signatory enforcement generally, and there are numerous international cases that allow non-signatory enforcement on facts like these. The Titan Unity case from Singapore, there are cases from France and Switzerland. All of these are very similar. You have a situation where A contracts with B and C actually performs the contract. And in those situations, because C is involved in performing A and B's contract, C can enforce the arbitration agreement if sued by one of the parties to the contract. So Singapore, France, Switzerland, and other cases cited in the briefs. Justice Sotomayor, you were looking for a limiting principle. I think there are limiting principles to equitable estoppel under domestic law, but the convention just doesn't speak to them. Third, Mr. Hacker argues that Congress, in effect, adopts – I'm sorry? It would depend on the contours of State law, but presumably State law would not allow you to just tag a random person on the street with no connection to the contract and say you're equitably estopped. There has to be a factual basis for the estoppel, and here there is for the reasons that we've been discussing. Mr. Hacker argues that Congress adopted the convention as both a floor and a ceiling for U.S. law. That's simply not what Congress did in Chapter 2. It created Federal jurisdiction where the agreement falls under the convention and then under 9 U.S.C. 206. If you have an agreement that falls under the convention, a Federal court exercising its jurisdiction can compel arbitration. It would do so by looking to domestic principles about when enforcement is proper. So in terms of how this case can be resolved, there's – the narrowest possible way is to simply hold that the Eleventh Circuit was wrong to apply a signatory requirement at Petition Appendix 15a to 16a. The Eleventh Circuit recounts the district court's finding that we were parties but says the reason we can't enforce is that we didn't actually sign. I think that's demonstrably wrong, and the narrowest possible way is to send it back for that reason. If the Court wants to provide additional guidance, there are two ways to do that, I think. One is to hold that the convention provides a floor, not a ceiling. I think that that follows from the text of the convention and also from international understanding. The second way to resolve it is, as Justice Sotomayor was suggesting, that the term parties in Article 2.3 is undefined. Domestic law fills that gap, as it does for many other things under the convention, terms like null and void, incapable of being performed. Those are not defined by the convention, but the convention looks at domestic law as it does for parties. Roberts. Thank you, counsel. The case is submitted.